# EXHIBIT

# A

06/07/2012 02:01:33 PM    713-755-1451                      Page 1 /7
Case 4:13-cv-01716   Document 12-1   Filed in TXSD on 08/14/13   Page 2 of 8
Filed 12 June 07 P2:02
Chris Daniel - District Clerk
Harris County
FAX15244162

CAUSE NO. 2012-28061

| | |
|---|---|
| LTHM HOUSTON-OPEARTIONS LLC<br>D/B/A ST. Anthony's Hospital | IN THE DISTRICT COURT |
| Vs | 127th JUDICIAL DISTRICT |
| NORTH AMERICAN HOSPITAL<br>SYSTEMS LLC, SULEMAN HASHMI, and<br>Dr. HASAN HASHMI | HARRIS COUNTY, TEXAS |

## AFFIDAVIT OF JASON LEDAY

STATE OF TEXAS

COUNTY OF HARRIS

Before me the undersigned authority, on this day personally appeared JASON LEDAY who, being duly sworn, upon his oath, stated as follows:

"My name is Jason Leday. I am over the age of eighteen (18) years of age, have never been convicted of a crime of moral turpitude, and I am competent to testify. I have personal knowledge of the facts stated herein, and they are true and correct.

On June 10, 2011, I, Jason LeDay, entered into an agreement to purchase LTHM – Houston Real Estate, LLC and LTHM – Houston Operations, LLC dba St. Anthony's Hospital. Effectively the agreement was to purchase a hospital, the real estate and operations of St. Anthony's Hospital for approximately 16,000,000.00 US dollars by way of assumption of the loans previously held by the hospital. The hospital is a fully operational general acute care hospital located at 2807 Little York Rd. Houston, TX 77093.

I formed a limited partnership, Little York Hospital RE, LP to hold the partnership interests of St. Anthony's Hospital. Little York Hospital RE GP, LLC is the general partner of Little York Hospital RE, LP which is solely owned and managed by myself.

There are three partners in Little York Hospital RE, LP; LeDay Interests, LLC, Little York POC, and Little York Health Sites, LLC. I am the sole owner of all of these companies.

Also, in June of 2011 I moved from Dallas, TX to Houston, TX to serve as the Chief Executive Officer of St. Anthony's Hospital. When I purchased the hospital

I was in discussions with Suleman Hashmi and his father Dr. Hasan Hashmi (collectively "Hashmis") to assist in the management of St. Anthony's Hospital. In addition to management of the hospital they were suppose to also bring a line of credit for working capital, funds for additional equipment specifically a Vascular C-Arm, CATH Lab, and MRI and to also bring physicians to the hospital specifically Cardiology, GI, Spine and Orthopedics to increase the number of patients and procedures at the hospital.

For providing these services, I verbally agreed to offer ownership to the Hashmis upon satisfactory completion of the tasks previously described. The Hashmis did provide a line of credit for working capital, but to date have not provided the other agreed upon services.

When I took over St. Anthony's, the hospital was losing about $200k per month. From the beginning the Hashmis rarely visited the hospital. I would estimate that on average they came to hospital every other month for a one day visit. Initially the Hashmis referred me to a Neurosurgeon. The Neurosurgeon to date has performed two cases in 10 months. The Hashmis also referred me to a psychiatrist. I entered into an agreement for the psychiatrist to manage an outpatient facility on behalf of the hospital. After a few months the outpatient facility had to immediately shut down for repeated non-compliance, and potentially created a legal liability with the psychiatrist. St. Anthony's no longer has a relationship with this psychiatrist.

The Hashmis did pay for a mini-C-Arm for the Hospital, but never provided any of the other agreed upon equipment, such as the CATH lab, MRI or Vascular C-Arm.

Despite the lack of management support from the Hashmis, the lack of physicians that the Hashmis were suppose to provide and the lack of the CATH lab, MRI or Vascular C-Arm, I made some key changes to the business operations and attracted my own group of physicians and St. Anthony's hospital turned a net profit in November of 2011.

Beginning in December of 2011, I began loaning the Hashmis money to support a hospital that they were managing in Grand Prairie ("NAHS"). The reason I loaned the Hashmis the money is because I am a small minority limited partner in NAHS. NAHS is large hospital, approximately 300,000 square feet in size and has a lot of opportunity to be successful if property managed. NAHS was closed and needed some remodeling. In June of 2010, I arranged $38MM in financing to acquire NAHS and an additional $16MM in construction financing. I had a consulting contract with NAHS as a bank liason assisting with draws and coordination of vendors but I had no authorization to sign off on any draws or vendor contracts. When I purchased the St. Anthony's and moved to Houston in June of 2011, my involvement in NAHS was minimized.

I wanted to see NAHS be successful and so I loaned NAHS the money. The expectation was that once NAHS was fully operational, the loan would be paid off.

The Hashmis were representing that they were going to either find additional investors for NAHS or invest in additional capital themselves. Even though St. Anthony's was doing well, I wanted to hamper the ability of St. Anthony's to establish a capital account to invest in replacing old and out-dated equipment and I let the Hashmis know I couldn't keep continuously loan the money.

In January of 2012, NAHS received a Temporary Certificate of Occupancy and officially opened up the hospital for business. Even with the hospital open, the Hashmis still needed money so I continued to loan them money. I would cover their payroll and even took some of my employees to the Grand Prairie hospital to help with the initial set-up of the hospital.

Beginning in February of 2012, I started being contacted by construction and equipment vendors of NAHS for questions regarding past due payments. In March of 2012, I began to learn of construction liens that were being placed on NAHS. I also discovered that the

construction punch list that was required to be completed to keep the Temporary Certificate of Occupancy valid had not been completed and many of the liens in place were from the vendors necessary to complete the construction punch list.

In addition, I learned that there was a third hospital ("Lancaster") that the Hashmis were utilizing money from NAHS to pay for Architectural drawings, contract labor, and repair of the HVAC. I have no ownership or affiliation with Lancaster so I was quite surprise to know I was loaning money to NAHS from St. Anthony's yet NAHS was using part of those funds to assist in the construction of Lancaster.

From a clinical standpoint, I spoke with Ron Nations with the nurse call system for NAHS. The invoice had not been paid for the nurse call and so the nurse call is not fully functional. This is a critical area for a hospital and is a life safety violation.

Part of the roof has blown off of the South Tower of NAHS. Previously when this happened when I was at NAHS, when it rained it damaged major electrical components in the hospital.

From my evaluation of the hospital, the hospital has infection control issues and a lack of knowledgeable staff to put the proper policies in procedures in place.

St. Anthony's HR director informed the Hashmis that their employee benefits had expired and was past their grace period. Potentially all of NAHS employees that had elected for employee benefits, had their benefits lapse for about two weeks. These benefits are paid directly from the checks of those employees 100%. Employees have told me of checks that have bounced from NAHS as well.

I recently received notice that Dallas Door is in the process of repossessing all the doors in the hospital. Koh Box, the electrician, is in the process of repossessing the ATI switches which are essential to the electrical system. There are multiple other recent lien holders on the property as well. Vendors also complained about checks that were written that bounced.

Equipment providers such as Stryker Medical, Toshiba, Steris and GE have contacted me about unpaid bills.

Stryker Medical was shocking because Stryker was one of the first equipment vendors NAHS purchased from. In September of 2010, NAHS issued purchase orders for medical beds, stretchers, OR communications equipment and endoscopy equipment totaling $777,923.00. In October of 2010, a request for a draw was made for this same Stryker Equipment for $1,418,975.08 and then to complete the order another draw request was made for $1,028,687 in December of 2010. The Hashmis received in bank advances $2,447,662.08 for an actual order that cost $777,923.00. The discrepancy totals $1,669,739.08 that is unaccounted for. In addition as of today, Stryker Medical is still owed about $30k which is extremely overdue.

In addition, I've noticed that the Hashmis live a pretty luxurious lifestyle. Since June of 2010, Suleman Hashmi has purchased multiple luxury cars such as a Lamborghini, a Bentley, a Fisker, and even bought his own personal limo. Dr. Hashmi has been seen driving a Bentley as well. Both of the Hashmis have taken multiple trips to Turkey and

Unofficial Copy Office of Chris Daniel District Clerk

Dubai. The most recent trip to Dubai occurring in March, Dr. Hashmi was gone for over a month.

I've also learned that Dr. Hashmi's Department of Public Safety license to administer controlled substance narcotics expired for at least a month in April of 2012. During this time, Dr. Hashmi was suspended from performing procedures at the Medical Center of Lewisville. Dr. Hashmi then performed those same procedures at Texas General Hospital with a suspended license. This creates a huge malpractice liability.

Taking all this in consideration, I came to the conclusion that the Hashmis do not have the expertise that they represented to manage a hospital and do not have the ability to fulfill their end of our verbal agreement. I was also willing to work out an arrangement to pay off the line of credit they provided, even though throughout this entire process I loaned the Hashmis a total of $1.4MM.

In April of 2012, I informed the Suleman Hashmi that I wouldn't be able to send them any additional money. I also removed them from all accounts of St. Anthony's. I originally allowed them to be on, in order for them to assist in the management of the hospital, even though all wires or transfers required my prior authorization.

On the morning of May 10, 2012, I was informed by my accountant that $375,000.00 had been transferred out of the St. Anthony's banking account. I immediately called the bank and was informed that Suleman Hashmi had made the transfer. The bank then reversed the transfer later that afternoon. I never authorized nor was informed that a transfer would happen. I had payroll that week and a transfer of that size could potentially cause me to not have enough to cover my employees.

On the afternoon of May 10, 2012, I received an email from my attorney informing me that the Hashmis had executed convertible note agreements to convert the interest of my limited partnership to the Hashmis and they would control 65% of my limited partnership and general partnership. Though I am familiar with the convertible note agreement, I have no recollection of signing this agreement. In addition, the agreement states that I borrowed a total of $2,000 to convert 65% of my limited partnership and general partnership over to them. In addition, it references a LLC agreement that doesn't exist. I was then presented with a Limited Partnership agreement and General Partnership agreement. The Hashmis claim that I have signed these documents as well, and I have no recollection of signing these documents either. The Hashmis also sign these agreements as members of my LLCs. The Hashmis were never and still are not members of my LLCs and therefore have no partnership interests in my limited partnership, general partnership or LLCs that hold the limited partnership interests.

On May 15, 2012, my attorneys and I had a meeting with the Hashmis and their attorneys to try and settle the matter. We did not come to any resolution.

On May 17 2012, while trying to make a routine transfer discovered an issue with the St. Anthony's bank account. I called the bank and they referred me to Erick Yollick, the attorney for First National Bank. My attorney contacted Mr. Yollick, and was informed that the Hashmis had contacted the bank attorney, presented their general partnership agreement and had voted me out of the partnership. My attorneys then presented my

documents to the bank and after much persistence, the bank has allowed the Hashmis and I to mutually agree on what checks are allowed to clear.

Since I've taken over the hospital I haven't had a returned check. The only checks I've had an issue with is if the vendor has improperly endorsed the check.

Since the Hashmis have had partial authority over the account checks are starting to be returned because the Hashmis are not approving checks in a timely manner. I send over all the documentation by 10am in the morning and haven't received any confirmation of receipt or approval. Included in these checks are payroll and checks to my vendors. My concern is that because this hospital has historically been distressed, I have had to build the reputation of St. Anthony's hospital.

My concern is that just in the last few days, the Hashmis have allowed two payroll checks to be returned which creates irreparable damage to a hospital such as St. Anthony's. My employees have to trust that we are financially sound in order to keep working. In addition, to attract specialized employees it is important that the hospital is seen as feasibly sound. One of the checks was for $5,000.00 to my Chief Nursing Officer. This is an Executive Officer of the Hospital and heads our entire clinical staff. In addition, this particular CNO has a PHd in Nursing and is an exceptional addition to the hospital. Having a CNO is a state regulation, and the loss of a CNO for non-payment can be detrimental to the hospital.

On 5/18/2012, a check for $6,930.00 was returned. This was a check to one of our key Doctors. Doctors are the life blood of a hospital. If the doctor loses trust in the hospital, then they simply practice elsewhere. The inability to fairly honor contracts to physicians can cause a exodus of key physicians that does not allow the hospital to properly care for the needs of the hospital.

On 5/19/2012 a check for $7,398.25 was returned. This check was to one of our staffing companies, Allied Health Services. This vendors provides us with specialized nurses for our critical care units. Without these critical care nurses, the hospital is not able to properly care for its patients.

On 5/19/2012, a checked for $1,948.50 was returned. The check was to Advantage Imaging. Advantage Imaging is the service provider to our CT Imaging Equipment. By state regulation, I can not operate a hospital without a CT. It is critical to have this vendor paid as to make service call if the CT does go down or needs repair.

On 5/20/2012, a check for $450.54 was returned. This check was to Sun Coast Resources. Sun Coast provides fuel for our back-up generators. It's imperative for our back-up generators to have fuel. If the power goes down, and we have patients on live-supporting devices, or in the operating room, we need to make sure that all critical areas of the hospital have power by utilization of these back-up generators.

On 5/20/2012, a check for $28,462.29 was returned. This check was to Healthy Minds. Healthy Minds is our psychiatric service that we provide to the community. My hospital has a contract with Healthy Minds to manage the facility that treats outpatient psych services. Not only does this limit our ability to treat these psych patients, but for non-payment of

Since the Hashmis have had partial authority over the account checks are starting to be returned because the Hashmis are not approving checks in a timely manner. I send over all the documentation by 10am in the morning and haven't received any confirmation of receipt or approval. Included in these checks are payroll and checks to my vendors. My concern is that because this hospital has historically been distressed, I have had to build the reputation of St. Anthony's hospital.

My concern is that just in the last few days, the Hashmis have allowed two payroll checks to be returned which creates irreparable damage to a hospital such as St. Anthony's. My employees have to trust that we are financially sound in order to keep working. In addition, to attract specialized employees it is important that the hospital is seen as feasibly sound.

I have checks that are written to my doctors. Doctors are the life blood of a hospital. If the doctor loses trust in the hospital, then they simply practice elsewhere. The inability to fairly honor contracts to physicians can cause a exodus of key physicians that does not allow the hospital to properly care for the needs of the hospital.

In addition, the inability to pay vendors limits the supplies that we have in the hospital to perform certain procedures. Without those supplies, we are unable to meet the needs of our community. As a hospital, we have a fulltime Emergency Room where we treat very critical cases. The inability to pay and order proper supplies puts our community at risk and can lead to a lack of preparation for critical patients which can ultimately lead to not being able to save a patients life that comes through our Emergency Department.

LTHM Houston-Operations LLC d/b/a St. Anthony's Hospital, Little York Health Sites LLC, Leday Interest LLC, Little York POC, and Jason Leday are willing to post bond.

FURTHER AFFIANT SAYETH NOT

_____
Jason Leday

Aaron v LeDay #57

CAUSE NO. 2012-28061

| | |
|---|---|
| LTHM HOUSTON-OPEARTIONS LLC<br>D/B/A ST. Anthony's Hospital | IN THE DISTRICT COURT |
| Vs | 127th JUDICIAL DISTRICT |
| NORTH AMERICAN HOSPITAL<br>SYSTEMS LLC, SULEMAN HASHMI, and<br>Dr. HASAN HASHMI | HARRIS COUNTY, TEXAS |

STATE OF TEXAS

COUNTY OF HARRIS

Before me the undersigned authority, on this day personally appeared JASON LEDAY who, known to me to be the person whose name is subscribed to the foregoing instrument and who acknowledged to me that he executed the document voluntarily for purposes and consideration herein expressed:

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 5th day of June, 2012.

_____
NOTARY PUBLIC

QUYNH VO
Notary Public
STATE OF TEXAS
My Comm. Exp. Sep. 29, 2015

Aaron v LeDay #58